IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **KIMBERLY L. SNOOK,** | ) | **CASE NO. 4:05CV3193** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter comes before the Court on the denial, initially and on reconsideration, of Plaintiff Kimberly L. Snook's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401-433 (2002), and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381-1383 (2002). The Court has carefully considered the record and the parties' briefs.

## PROCEDURAL BACKGROUND

The Plaintiff, Kimberly L. Snook, filed her initial applications for Disability and SSI benefits on July 9, 2003. (Tr. 70-72; 250-52). The claims were denied initially (Tr. 38-41) and on reconsideration (Tr. 44-48). An administrative hearing was held before Administrative Law Judge ("ALJ") Jan E. Dutton on September 9, 2004. (Tr. 17-27). On December 9, 2004, the ALJ issued a decision finding that Snook was not "disabled" within the meaning of the Act and therefore was not eligible for either disability or SSI benefits. (Tr. 27). On June 5, 2005, the Appeals Council denied Snook's request for review. (Tr. 8-11). Snook now seeks judicial review of the ALJ's determination as the final decision of the Defendant, Jo Anne B. Barnhart, the Commissioner of the Social Security Administration ("SSA"). (Filing No. 1).

Snook claims that the ALJ's decision was incorrect because the ALJ failed to: 1) properly assess Snook's residual functional capacity ("RFC"); and 2) properly apply *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), when evaluating Snook's credibility regarding her subjective allegations of physical and mental condition as to her limitations, restrictions, and work-like activity. (Filing No. 10 at 9).

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Snook is now forty years old. (Tr. 70, 261). She has completed the ninth grade, but did not complete high school. (Tr. 262). She does not have a General Equivalency Degree ("GED"). (*Id.*). Snook's past relevant work assignments include: cashier, waitress and bartender. (Tr. 263). Since January 27, 2003, Snook has not engaged in any substantial gainful employment. (Tr. 18, 84). She claims disability due to multiple impairments, including back pain. (Tr. 38).

### *Snook's Testimony*

At the hearing, Snook testified that her work history includes primarily part-time jobs. (Tr. 264). She worked as a waitress and bartender for approximately thirteen years and worked in approximately five restaurants. (Tr. 263-64). Most recently, she worked as a cashier. (Tr. 265). She stopped working after her back went out while stocking items. (*Id.*).

Snook testified that doctors have advised her that her back injury was problematic enough to have surgery; however, they advised her that she needed to lose weight and stop smoking before surgery could be performed. (Tr. 266). Snook is 5'3" tall. (Tr. 237). At one time, Snook weighed 320 pounds. (*Id.*). She managed to lose some weight and has since gained back some of that weight. (Tr. 18). Her weight at the time of the hearing was 240 pounds. (*Id.*). She claims that weight loss has not improved her condition. (Tr. 266-67). Snook underwent breast reduction surgery that was designed to help her back; however, she claims that although the surgery helped her neck, it did not improve her back pain. (*Id.*). She discussed gastric bypass surgery with her doctor, but she was afraid to undergo the procedure due to the risks. (Tr. 280). She takes Hydrocodone to relieve her back pain. (Tr. 267). Snook claims her medication makes her dizzy. (Tr. 275). On a scale of 1-10, she rates her pain as an 8 without medication and a 5 with medication. (Tr. 268). She claims her pain is occasionally a 10 when she overexerts herself. (Tr. 269).

Snook is divorced and has two children. (Tr. 262). Her minor daughter lives with her. (Tr. 263). She receives child support, housing assistance, and Medicaid. (Tr. 262, 268). She has received food stamps in the past but was not receiving them at the time of the hearing. (Tr. 262). Snook testified that on a typical day she showers and dresses, cleans the house, watches television, paces around the house, and walks outside. (Tr. 272). She testified that she basically only leaves the house on the weekends. (Tr. 278). When she leaves, she needs someone to drive her. (*Id.*). Snook stated that she does not have any hobbies. (Tr. 279). She claims she is unable to sit for more than ten minutes or stand still, so she either lies on her side, walks, or sways back and forth. (Tr. 272). She

3

testified that her children and boyfriend help her with household chores. (Tr. 276). She claims she cannot lift more than ten pounds. (*Id.*).

The ALJ noticed that Plaintiff was tan and asked if she spent time outdoors. (Tr. 280). In response, Plaintiff stated that she spent time outdoors watching her daughter, smoking cigarettes, and watching her son's softball games. (*Id.*).

### *Vocational Expert's Testimony*

Testimony was also heard from a vocational expert ("VE"), Michael McKeeman, under contract with the Social Security Administration ("SSA"). (Tr.17, 281-88). The ALJ's first question to the VE concerned light work. (Tr. 282). The VE testified that, assuming Snook could occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; occasionally climb, crawl, stand, kneel, and perform postural activities; and avoid ladders, ropes, and scaffolds, then she could perform her past relevant work of cashiering as it is "performed sometimes in the national economy." (*Id.*). Assuming these same limitations, the VE testified that Snook could also perform her past work as a waitress. (*Id.*). The VE stated that based on these limitations and under the criteria of the Dictionary of Occupational Titles ("DOT"), she could perform her past work as a bartender, but the VE states that, in his opinion, she would have difficulty bartending. (*Id.*).

The ALJ's next question concerned sedentary work. (*Id.*). Assuming the same restrictions as above, but limiting the time Snook spent on her feet to two hours per day, the VE testified that Snook would have minimal transferable skills. (Tr. 283). The VE stated that Snook would be able to work as a cashier/checker at the sedentary exertional

level in unskilled or semi-skilled jobs. (*Id.*). The VE testified that there were 5,900 semi-skilled positions and 800 or 900 unskilled positions that fit this description in Nebraska. (*Id.*). In addition to her past relevant work as a cashier/checker, the VE testified that assuming these same limitations, Snook would be able to perform ninety percent or more of the unskilled, sedentary jobs available to her. (Tr. 284). Of these positions, fifty percent would be available to her if she required a sit/stand option, including: cashiering, interviewing-type jobs, and administrative support jobs. (*Id.*). The VE testified that there were 150 interviewing jobs and 150 administrative support jobs that fit this description in Nebraska. (*Id.*). The VE also testified that Snook could hold the positions of compact assembler, telephone quotation clerk, and hand-mounter under the second hypothetical. (*Id.*).

The VE testified that if Snook's testimony regarding her limitations was considered credible, she would be unable to perform any of her past work or the sedentary jobs the VE identified. (Tr. 285). The VE testified that she would have difficulty if she had to switch positions frequently throughout the day, particularly the alleged need to lie down two hours of the day. (*Id.*).

***Documentary Evidence Before the ALJ***

In addition to oral testimony, the ALJ considered medical evidence. On February 18, 2003, Snook underwent an MRI of the lumbar spine which revealed abnormalities, including: a disc protrusion at L4-5, central canal stenosis, and ligamentous and facet joint

hypertrophy at L5-S1.[1]  (Tr. 185).  These abnormalities were characterized as mild or moderate.  (*Id.*).

Snook was seen by Dr. Messer on February 27, 2003.  (Tr. 200-02).  She told Dr. Messer that she had experienced lower back pain for several years and had recently developed pain in her legs.  (Tr. 200).  Upon physical examination, Snook demonstrated: the ability to walk on her toes and heels, normal gait, no weakness in any muscle group, normal neurological findings, no obvious scoliosis, and full hip range of motion.  (Tr. 201).  At that time, Snook stated that she did not require any pain medication.  (Tr. 200).  Dr. Messer stated that her back pain was predominantly mechanical in nature and noted that she was a poor candidate for a disc fusion due to her weight, smoking history, and lack of radicular symptoms.  (Tr. 201-02).  He also stated that she might as well return to work because she was not showing improvement being off work.  (Tr. 202).

On March 11, 2003, Snook was seen by her general treating physician, Dr. Schneider, who prescribed Vicoprofen for pain relief.  (Tr. 187).  The following day, she was prescribed Skelaxin and a Medrol Dosepack also for pain relief.  (*Id.*).  On March 16, 2003, she was seen in the emergency room complaining of low back pain with right leg radiculopathy.[2]  (*Id.*).  She was given Vistaril and told to avoid "strenuous activity."  (Tr. 187-188).

---

[1]"Stenosis" refers to a stricture or narrowing.  *Stedman's Medical Dictionary* 1695 (27th ed. 2000).  "Hypertrophy" refers to an increase in size.  *Id.* at 857.

[2]"Radiculopathy" is a "[d]isorder of the spinal nerve roots."  *Stedman's Medical Dictionary* 1503 (27th ed. 2000).

On March 19, 2003, Snook was examined by orthopedist Dr. Vande Guchte. (Tr. 189-90). He determined her problems included: obesity, tobacco use, lumbar spondylosis, displacement of intervertebral disc without myelopathy, degenerative disc disease of the lumbar spine, lumbar spine pain, and lumbar radiculitis.[3] (*Id.*).

On follow up on April 3, 2003, Dr. Schneider noted that there was no evidence of any disc or ligament injury. (Tr. 210). Dr. Schneider stated that the radicular symptoms from Snook's back were causing numbness in her right leg and causing her knee to give out on her. (*Id.*). He advised her that she needed to stop smoking and take off more weight; otherwise, she would not be able to have surgery. (*Id.*).

On August 22, 2003, Snook was evaluated by physical therapist, Tiffany Beiermann. (Tr. 2004). The plan of treatment was to include moist heat, ultrasound, soft tissue mobilization, a lumbar stabilization exercise program and possibly pelvic attraction. (*Id.*). In a letter dated September 5, 2003, the physical therapist noted "Kim received one treatment of her low back pain. She canceled her second appointment, reporting she received an injection and is pain-free and we have not heard back from her." (Tr. 203).

Snook was seen by Dr. Messer on August 26, 2003, in a follow-up from her February appointment. (Tr. 198). Snook reported to Dr. Messer that her back pain had increased to the point where she felt she could not do anything. (*Id.*). She stated that she could not dress herself. (*Id.*). Snook denied any bowel or bladder dysfunction or leg weakness. (*Id.*). Dr. Messer recommended a course of epidural steroid injections; however, Snook did not follow through with these. (*Id.*). She reported that she had a

---

[3]"Spondylosis" is a stiffening of the vertabra. *Stedman's Medical Dictionary* 90, 1678 (27th ed. 2000). "Myelopathy" is a "[d]isorder of the spinal cord." *Id.* at 1171.

7

gastric bypass surgery scheduled for April. (*Id.*). Also, she reported to Dr. Messer that a procedure done during physical therapy made her pain "5,000 times worse." (*Id.*). On August 26, 2003, the plaintiff underwent an epidural steroid injection. (Tr. 203).

In August 2003, Dr. Schneider indicated that the plaintiff was not ready for a functional capacity assessment and told her that she needed to recover from the acute spasm and pain and return to a baseline or chronic state before a proper assessment could be done. (Tr. 207). A Functional Capacity Evaluation was performed on September 16 and 17, 2003. (Tr. 235-243). The evaluator concluded that Snook could lift ten pounds occasionally but could not sit most of the day. (Tr. 236). The evaluator noted that under the Department of Labor Physical Demand level, the sedentary work category suggests a client can lift ten pounds occasionally and sit most of the day. (*Id.*). The evaluation indicated that the plaintiff would be able to lift fifteen pounds occasionally from floor to waist and ten pounds frequently. She would be able to lift fifteen pounds occasionally from waist to overhead and lift fifteen pounds frequently. She would be able to lift twenty pounds occasionally and horizontally lift ten pounds frequently. She would be able to carry with her right hand fifteen pounds occasionally and ten pounds frequently. She could do the same with the left hand and with a front carry. She could frequently perform elevated work, forward bending/sitting, forward bending/standing, rotation sitting, rotation standing, kneeling and repetitive squat, and she should never crawl or crouch. She would need to change positions every five minutes or less while sitting or standing. The evaluator indicated Snook could walk continuously so long as she could change positions every five to six minutes and have continuous coordination with the right and left upper extremities.

She could frequently stair climb and stepladder climb but should never balance. (Tr. 241-243).

On October 10, 2003, Dr. Schneider noted that Snook continued to have upper back and neck pain and concluded that she would benefit from reduction mammoplasty. (Tr. 219). Snook was evaluated for this procedure by Dr. Bryant on October 14, 2003, and he determined that she was an excellent candidate for the procedure. (Tr. 215). The procedure was performed on April 2, 2004. (Tr. 229).

On April 17, 2004, the plaintiff was treated in the emergency room after complaining of postoperative bleeding from the wounds in one of her breasts. (Tr. 220). On July 31, 2004, the plaintiff was seen in the emergency room after experiencing a "pop" in her right calf area. A Doppler study revealed no evidence of deep or superficial vein thrombosis. (Tr. 222).

## THE ALJ'S DECISION

The ALJ found that Snook was not "disabled" within the meaning of the Social Security Act. (Tr. 27). The ALJ framed the issues as: 1) whether Snook was entitled to disability and SSI benefits under the Act; and 2) whether Snook was "disabled." (Tr. 17-18).

The ALJ followed the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920 (2005)[4] to determine whether Snook was disabled, considering:

> any current work activity, the severity of any medically determinable impairment(s), and the individual's residual functional capacity with regard to his or her ability to perform past relevant work or other work that exists in the regional and national economies. This latter step requires an assessment of the individual's age, education and past work experience.

(Tr. 18).

---

[4]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits. For simplicity, further references will only be to § 404.1520.

9

Following this analysis, the ALJ found that Snook was not disabled. (Tr. 27). Specifically, at step one, the ALJ found that Snook has not performed any substantial gainful work activity since January 27, 2003. (Tr. 26). At step two, the ALJ found Snook's degenerative disc disease of the lumbar spine with mechanical back pain and obesity were considered severe within the meaning of the Act's regulations. (*Id.*). At step three, the ALJ found Snook's medically determinable impairment did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4., known as the "listings." (*Id.*). At step four, the ALJ determined Snook was able to return to her past relevant work as a cashier and would be also be able to perform ninety percent of the full range of unskilled work. (*Id.*).

In so deciding, the ALJ weighed Snook's testimony, finding her testimony was not credible in view of the criteria set forth under 20 C.F.R. §§ 404.1529 and 416.929, Social Security Ruling ("SSR") 96-7p, and *Polaski*. (Tr. 27). The ALJ also carefully considered the medical records submitted by physicians, Dr. Messer, Dr. Schneider, and Dr. Vande Guchte. (Tr. 18-21). The ALJ found Snook was not disabled, was not entitled to a period of disability or the payment of disability insurance benefits, and was not eligible for payment of supplemental security. (Tr. 27).

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Eichelberger v. Barnhart,* 390 F.3d 584, 589 (8th Cir. 2004). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether

substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir. 1995).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.* As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000).

## DISCUSSION

### *"Disability" Defined*

An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be of such severity that the claimant is "not only unable to do [her] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). If the claimant argues that she has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

***Sequential Evaluation***

In determining disability, the Act follows a sequential evaluation process.  *See* 20 C.F.R. § 416.920.  In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work.  *Id.* § 416.920 (a)(4)(I)-(v).  If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is made.  *Id.*

In this case, the ALJ completed the process at step four, concluding: 1) Snook has not performed any substantial gainful work activity since January 27, 2003; 2) Snook's degenerative disc disease of the lumbar spine with mechanical back pain and obesity were considered severe within the meaning of the Act's regulations; 3) Snook's medically determinable impairment did not meet or medically equal one of the "listings;" and 4) Snook was able to return to her past relevant work as a cashier and would also be able to perform ninety percent of the full range of unskilled work.  (Tr. 18-25).

***Credibility of Snook's Testimony***

Snook argues that the ALJ did not properly assess her credibility.  (Filing No. 15 at 8-12).  The ALJ found that Snook's testimony was not credible in view of the criteria set forth under 20 C.F.R. §§ 404.1529 and 416.929, Social Security Ruling ("SSR") 96-7p, and *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).  (Tr. 26).  Specifically, the ALJ found that Snook's testimony was not credible "insofar as it pertained to the inability to perform virtually any type of work activity on a sustained basis. . . ."  (Tr. 25).

The credibility of Snook's testimony in its entirety is crucial because, in determining the fourth and fifth factors relating to a claimant's residual functional capacity to perform past relevant work and a range of work activities in spite of her impairments, the ALJ must evaluate the credibility of a claimant's testimony regarding subjective pain complaints.  The underlying issue is the severity of the pain. *Black v. Apfel,* 143 F.3d 383, 386-87 (8th Cir. 1998). The ALJ is allowed to determine the "authenticity of a claimant's subjective pain complaints." *Ramirez v. Barnhart,* 292 F.3d 576, 582 (8th Cir. 2002) (citing *Troupe v. Barnhart,* 32 Fed. Appx. 783, 784 (8th Cir. 2002); *Clark v. Shalala,* 28 F.3d 828, 830-31 (8th Cir. 1994)).  An "'ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.'" *Haley v. Massanari,* 258 F.3d 742, 748 (8th Cir. 2001) (stating the issue was whether the record as a whole reflected inconsistencies that discredited the plaintiff's complaints of pain) (quoting *Gray v. Apfel,* 192 F.3d 799, 803 (8th Cir.1999)).

Also, an ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate. *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001).

The *Polaski* standard is the guide for credibility determinations:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The

> adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication; and
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

Interpreting the *Polaski* standard, §§ 404.1529 and 416.929 discuss the framework for determining the credibility of subjective complaints, e.g., pain.

An ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints. *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000). This duty is fulfilled when an ALJ acknowledges the *Polaski* factors, and the ALJ has clearly examined the factors before discounting the claimant's testimony. An ALJ is "not required to discuss methodically each *Polaski* consideration." *Id.* at 972.

The federal regulations provide that the ALJ must consider all symptoms, "including pain, and the extent to which symptoms can reasonably be accepted as consistent with the objective medical evidence," defined as "medical signs and laboratory findings." 20 C.F.R. § 416.929. Medical "signs" are defined as:

> anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological

abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. § 416.928(b).

"Laboratory findings" are defined as: "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests."

20 C.F.R. § 416.928©).

Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record. Ruling 96-7p provides that the ALJ must consider such factors as:

1)  The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

2)  The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

15

> 3) The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996).[5]

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain. *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although every factor may not have been discussed).

In Snook's case, the record indicates that the ALJ performed a thorough *Polaski* analysis in determining the credibility of Snook's subjective pain complaints. The ALJ considered Snook's daily activities, which include: showering; dressing; trying to clean the house; watching tv; and pacing, walking, or swaying back and forth while standing. (Tr. 24). The ALJ summarized in detail Snook's pain complaints, including Snook's degenerative disc disease, back pain, and obesity. (Tr. 18-21, 23-24). The ALJ considered the fact that on a scale of 1-10, Snook rated her pain as an 8 without medication and a 5 with medication. (Tr. 24). The ALJ noted that Snook's obesity and smoking were contributing factors to her condition and that Snook had been advised to lose weight and quit smoking. (Tr. 20, 24). The ALJ considered the fact that Snook had been prescribed various medications for pain relief, including Vicoprofen, Skelaxin, and

---

[5]Social Security Ruling 96-7p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.

Medrol Dosepak. (Tr. 19). The ALJ also recognized that Snook had taken anywhere between two and eight Hydrocodone pills on daily basis for over a year prior to the hearing. (Tr. 23). The ALJ noted that Snook at one time reported she was "pain free" after receiving a steroid injection. (Tr. 24). Finally, the ALJ considered Snook's functional restrictions.

The ALJ also noted that Snook's work record had been "somewhat spotty" and that she received child support and housing assistance.[6] (Tr. 25). The ALJ noted that Snook was very tan, and Snook claimed it was a result of being outdoors with her daughter and attending her son's athletic activities. (Tr. 24). The ALJ opined that this was indicative of some level of physical and social activity. (*Id.*). The ALJ also noted that none of Snook's treating or examining physicians indicated she was unable to work. (Tr. 25).

In summary, the ALJ thoroughly considered Snook's subjective pain complaints and the reports of her physicians. The ALJ correctly engaged in the *Polaski* analysis. The ALJ set out the standards stated in §§ 404.1529 and 416.929, and the ALJ acknowledged the *Polaski* standard as well as applicable regulations and SSR 96-7p. (Tr. 25-26). The ALJ's conclusion that Snook's pain is not severe enough to prevent her from engaging in some of her past relevant work was well-founded, and followed an appropriate express credibility determination regarding Snook's assertion of subjective complaints. Therefore, the Court finds the ALJ's express credibility determination that Snook's testimony was not credible is substantially supported by the record as a whole.

---

[6] A lack of work history has specifically been found to indicate poor motivation. *Pearsall,* 274 F.3d at 1218. Similarly, the Eighth Circuit has recognized that a poor work history lessens a claimant's credibility. *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir.1993)

*Residual Functional Capacity*

Snook argues that the ALJ improperly assessed her RFC. (Filing No. 10 at 9). Essentially, Snook argues that the ALJ improperly discounted the evaluator's recommendation in Snook's Functional Capacity Evaluation that Snook change positions every five when sitting or standing. (Filing No. 10 at 10-11; Tr. 242). The VE testified that if it were true that Snook needed to change positions so frequently, she would not be able to perform her past relevant work or any other work in the national economy. (Tr. 287).

Residual functional capacity is defined as what Snook "can still do despite . . . limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2001). Residual functional capacity is an assessment based on all "relevant evidence," *id.*, including a claimant's description of limitations; observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of his limitations. *Id.* §§ 404.1545(a)-(c), 416.945(a)-(c); *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000). Before determining residual functional capacity, an ALJ first must evaluate the claimant's credibility.

The ALJ bears the primary responsibility for assessing Snook's residual functional capacity based on the relevant evidence. However, Snook's residual functional capacity is a medical question. *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir. 2001). The ALJ must resolve any conflict in the medical evidence, but some medical evidence "'must support the determination of the claimant's [residual functional capacity], and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Id. at 711, 712 (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). "To

properly determine a claimant's residual functional capacity, an ALJ is therefore 'required to consider at least some supporting evidence from a [medical] professional.'" *Id.* (quoting *Lauer,* 245 F.3d at 704).

In Snook's case, the ALJ followed the procedures in determining that Snook retained the residual functional capacity ("RFC") to return to her past relevant work as a cashier and also ninety percent of the full range of unskilled work. (Tr. 26). As noted above, the ALJ first found Snook's testimony was not credible insofar as it attempted to establish total disability. (Tr. 26). Next, the ALJ specifically considered, in addition to Snook's testimony, documentary evidence, including reports of treating and consultative physicians, a Functional Capacity Evaluation ("FCE"), and the testimony of the VE. The evaluator who performed the FCE recommended that Snook change position every five minutes when sitting or standing. (Tr. 242). The FCE was referred to in both the hearing and in the ALJ's decision, demonstrating that the ALJ considered the FCE in reaching her decision. (Tr. 25, 285-287). The Court notes that the ALJ considered a wide array of medical evidence in addition to the FCE and was not required to include every limitation set forth in the FCE in her assessment of Snook's RFC. The Court also notes that contrary to the FCE, Snook's own testimony indicates that she only needs to change positions from sitting every ten minutes. (Tr. 272).

The ALJ recognized that none of the physicians who treated or examined Snook determined she was unable to work. (Tr. 25). Furthermore, the ALJ properly consulted a VE during Snook's hearing and considered his testimony. Based on her assessment of Snook's credibility, the medical evidence, and the testimony of the VE, the ALJ determined Snook has the residual functional capacity to perform her past relevant work as a cashier

19

as well as ninety percent of the full range of unskilled work. (Tr. 26). The Court finds that the ALJ's assessment of Snook's RFC is supported by the record as a whole.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 26th day of July, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge